UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEPHANIE CORTEZ                         CIVIL ACTION

VERSUS                                   NUMBER: 13-0074

CAROLYN W. COLVIN, ACTING                SECTION: "E"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 10, 11).

Stephanie Cortez, plaintiff herein, filed the subject application for DIB on November 22, 2010, with a protective filing date of November 9, 2010, alleging disability as of December 9, 2006.  (Tr. pp. 125-133, 156).  In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as a herniated disc in the lower back and nerve damage in both legs.  (Tr. p. 174).  Plaintiff's application

for DIB was denied at the initial level of the Commissioner's administrative review process on January 14, 2011. (Tr. pp. 63-66). Pursuant to plaintiff's request, a hearing de novo before an ALJ went forward on September 16, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 68-69, 22-56). On November 16, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-21). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.    THE ALJ ERRED IN ASSESSING PLAINTIFF'S SEVERE IMPAIRMENTS.

II.   THE ALJ ERRED IN DETERMINING PLAINTIFF'S RFC.

III.  THE ALJ ERRED BY RELYING ON A DEFECTIVE HYPOTHETICAL.

(Rec. doc. 10-2, p. 7).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant last met the insured status requirements of the Social Security Act on September 30, 2011.

2.   [t]he claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 9, 2006

2

through her date last insured of September 30, 2011 (20 CFR 404.1571 *et seq.*).

3. [t]hrough the date last insured, the claimant had the following severe impairments: lumbar disc disease [at] L5-S1 with radiculopathy and cervical disc disease [at] C5-7 with radiculopathy (20 CFR 404.1520(c)).

4. [t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. [a]fter careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except, the claimant has an inability to operate foot controls with the right foot and she has an inability to climb ladders, ropes or scaffolds. Further, she can only occasionally stoop, crouch, kneel, and crawl; and she can only occasionally perform overhead reaching with the arms.

6. [t]hrough the date last insured, the claimant was capable of performing [her] past relevant work as a hairdresser. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. [t]he claimant was not under a disability, as defined in the Social Security Act, at any time from December 9, 2006, the alleged onset date, through September 30, 2011, the date she was last insured under Title II of the ACT (20 CFR 404.1520(f)).

(Tr. pp. 13, 14, 17).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v.</u>

3

Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1983).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  Once the claimant carries her initial burden, the Commissioner then

4

bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities.

Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n.2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

The medical records that were admitted in the administrative proceedings below begin with the report of an MRI, without contrast, that was performed at the Thibodaux Regional Medical Center on December 27, 2006. The reason for the testing was identified as a lumbar strain and the impression was mild multilevel disc disease involving L3-4, L4-5, and L5-S1, with the overall spinal canal stenosis being most significant at L4-5 but still only mild in nature and with moderate bilateral neuroforminal narrowing at that level. (Tr. pp. 201-202, 216-217, 232-233).

On February 12, 2007, plaintiff was evaluated by Dr. Deepak Awasthi at the request of Dr. Dick Ory in connection with complaints of right-sided low back pain. Plaintiff related that she was doing well until December 11, 2006 when she hurt her back while picking up a saw at work, resulting in significant low back

pain with radiation down the right buttock and leg and occasional feelings of numbness and tingling in the right leg and foot. The right leg symptoms had improved since then but low back pain, predominantly on the right, still existed which was especially prominent with activity and made it difficult for her to mop, vacuum, sweep, or do laundry. Pain was at a level of "5" on average. Plaintiff did not work at all for the first six weeks following the incident but resumed light duty work on January 26, 2007, missing three days of work thereafter because of pain. She had attended physical therapy which did provide her with temporary relief, was on medication, had a cortisone injection in the back three to four weeks earlier, and had twice done a course of Medrol Dosepak.

Upon physical examination, plaintiff had a decreased range of back motion, especially with extension and lateral movement. There was a moderate amount of spasm in the paraspinous area, more on the right than the left, as well as mild tenderness to palpation. Range of motion in the extremities was normal and there was good strength in all muscle groups except for reproducible mild weakness in the right extensor hallucis longus which was rated as 4/5. Tone was normal and there was no atrophy. There were some sensory changes in the right foot that were difficult to describe but reflexes and gait were normal. Having had an opportunity to review the results of the earlier MRI, Dr. Awasthi opined that plaintiff

suffered from only mild changes in the lumbar spine for which surgical intervention was not recommended.  Conservative care was to be continued, epidural injections ("ESI") were to be considered, and plaintiff was referred to Dr. Haydel for further management. (Tr. pp. 188-189, 219-220).

Pursuant to Dr. Awasthi's referral, plaintiff was seen by Dr. Michael Haydel of the Pain Speciality & Spine Care Center on March 14, 2007.  Her pain was rated as a "6" and her medications were to remain unchanged as they produced no side effects and had improved plaintiff's sleep, ambulation, social activity, activities of daily living, and mood.  Nevertheless, plaintiff complained of constant stabbing and shooting pains in the low back with occasional dull pain and a burning sensation down the posterior aspect of the right leg which did not progress below the knee.  She associated an inability to sleep with her condition and indicated that her symptoms were exacerbated by bending forward and backward at the waist as well as prolonged standing, walking, and driving. Contrary to what she had reported to Dr. Awasthi, plaintiff stated that physical therapy had not improved her condition.  Plaintiff reported no relief after receiving an epidural steroid injection and another one was planned.  (Tr. pp. 193, 210).

Plaintiff returned to Dr. Awasthi on April 9, 2007 with continued complaints of right-sided low back pain which had not been significantly relieved after receiving three ESI's.  The pain

8

was at a level of "6" on average with no significant radiation down the legs but with occasional numbness and tingling in the right leg. Given the persistent symptoms, Dr. Awasthi requested an EMG, nerve conduction studies ("NCS"), and a myelogram with a post CT scan to rule out any nerve root compression in the lumbar spine. At that point in time, the doctor had cleared plaintiff to return to sedentary-level work with no prolonged periods of sitting or standing and with frequent breaks between sitting and standing. (Tr. pp. 187, 221). An EMG and NCS were performed on April 26, 2007 which produced evidence of a very mild chronic partial well-compensated right S1 radiculopathy. (Tr. pp. 200, 215, 229). A CT myelogram of the lumbar spine was conducted on May 1, 2007 which revealed a minimal broad-based disc bulge at L4-5 contributing to only mild spinal canal stenosis and mild bilateral neural foraminal narrowing. No significant lateral recess narrowing, significant bony stenosis of the spinal canal, or neural foramina were identified at any level. (Tr. p. 228).

Two days later, plaintiff was seen again by Dr. Awasthi who noted worsening radiation into the leg following the lumbar myelogram and post CT scan. The three ESI's had not produced significant relief. Given plaintiff's continued symptoms and the lack of evidence of nerve root impingement, the doctor was in somewhat of a "quandary" as to the best approach for plaintiff's care. A lumbar discogram was ordered to better formulate a

treatment plan.  (Tr. pp. 186, 222).  Significant right-sided low back pain with radiation all the way into the foot was present on June 4, 2007.  Pain averaged at a level of "6" to "7" and there were continued signs of radiculopathy in the right foot.  Given those symptoms, Dr. Awasthi did not believe that plaintiff was able to perform any type of work as she was unable to sit or stand for a prolonged period of time and was unable to lift anything heavier than five pounds.  Because his request for a discogram had been denied and in the absence of any planned surgical intervention, Dr. Awasthi opined that plaintiff had reached maximum medical improvement ("MMI").  (Tr. pp. 185, 223).

Plaintiff was next seen by Dr. Haydel on July 5, 2007. Medications at the time included Hydrocodone, Skelaxin, Flexeril, and Medrol Dosepak.  External signs of distress occurred with ambulation and climbing onto the examination table but ambulation could be done independently.  Strength in flexion was 3/5 on the right and 5/5 on the left and straight leg raising was positive on the right.  The impression was low back pain with right lower extremity symptoms and multilevel lumbar disc disease.  A right S1 transforaminal injection with fluroscopy was scheduled, Ambien was added to plaintiff's medication regimen, and she was given prescriptions for Flexeril and Lorcet.  (Tr. pp. 208-209).

On August 27, 2012, plaintiff underwent a discogram at the L4-5 and L5-S1 levels.  At the former level, the testing was positive

for concordant pain and difficulty sustaining pressure within the disc but testing at the latter level was negative although there was some reproducible non-concordant pain.  A subsequent CT scan of the lumbar spine revealed a mild annular bulge asymmetric to the right at L5-S1 but no other significant disc bulge or protrusion. (Tr. pp. 198-199, 213-214, 226).

Plaintiff returned to Dr. Awasthi on September 24, 2007 and reported that her low back pain was then bilaterally located with pain down both legs.  Based on the recent discogram results, the doctor believed that plaintiff's symptoms were likely related to the degenerative changes at the L4-5 disc.  As plaintiff was still on Workers' Compensation at the time, approval was to be sought for an anterior lumbar interbody fusion at L4-5.  (Tr. pp. 184, 224).

The next medical report that was admitted in the administrative proceedings below was not generated until August 19, 2010, nearly three years after her visit with Dr. Awasthi on September 24, 2007, when plaintiff was seen again by Dr. Haydel. Plaintiff reported that she had discontinued the use of Naprelan several months earlier as she was no longer experiencing neck pain. Her most significant pain was in the lower back at a level of "4" but medication was helpful.  The impression was lower back pain with right lower extremity symptoms and multilevel lumbar disc disease, lumbar radiculopathy, and neck pain and cervicalgia. Refills were given on her medications.  (Tr. pp. 192, 207).

11

Plaintiff was next seen by Dr. Haydel on November 15, 2010, reporting that Ambien CR worked better than Ambien. Her most significant pain was in the bilateral lower extremities but was "much relieved" with medications. The impression was the same as the previous visit. Plaintiff was given refills for Ambien CR, Lortab, and Flexeril and was to return to the clinic in three months. (Tr. pp. 191, 194, 206).

Plaintiff's pain was rated as an "8" when she was next seen by Dr. Haydel on February 10, 2011 even though she reported that her medications were effective. She had recently begun taking Soma/Naprelan and related that she had recently bent over and had a severe flare of lower back pain, getting "stuck" in one position. The impression remained unchanged. Plaintiff was instructed to take over-the-counter NSAID's for two weeks, was given refills for Flexeril, Ambien, Lortab, was administered an injection of Depo Medrol, and was to return in three months. (Tr. p. 205).

Plaintiff presented to the Ochsner St. Anne General Hospital Emergency Room ("ER") on April 9, 2011 with complaints of an intense headache, reporting that she experienced migraine headaches every three months. Plaintiff was treated with Demerol and Phenergan and was discharged with instructions to follow-up with her primary care physician. (Tr. pp. 258-269). She was seen again by Dr. Haydel on May 10, 2011 for the purpose of obtaining medication refills. On this date, plaintiff's pain was rated as a

12

"5" and like previous visits, she was noted to ambulate without assistance and was said to be doing well on her current medications. Plaintiff was given refills on her three medications, was to take over-the-counter NSAID's as needed, and was to return in three months. (Tr. p. 235). On August 3, 2011, plaintiff presented a second time to the Oschner St. Anne ER for treatment of a migraine headache that was positive for photophobia, nausea, and vomiting as well as spasms in the neck and shoulders. She also complained of cold sweats/hot flashes. Plaintiff advised the attending medical personnel that she was disabled secondary to a "sciatic nerve tear" several years earlier. Upon physical examination, plaintiff had tenderness to the trapezius muscles bilaterally as well as the sternocleidomastoid muscles. She was treated with IV fluids, Demerol, and Phenergan but refused Compazine as it made her feel strange. She was ultimately discharged in stable condition with prescriptions for various medications and a neurology referral. (Tr. pp. 242-257).

On August 5, 2011, plaintiff was seen again by Dr. Haydel and her back pain was rated as a "7". She complained of severe bilateral lower extremity radicular pain, severe migraines for the previous two to three days, and low back and neck pain. Plaintiff had discontinued the use of Flexeril because it was not helpful but her other medications were somewhat effective with no side effects. Straight leg raising was reported as positive. The impression was:

1) low back pain with right lower extremity symptoms and multilevel lumbar disc disease; 2) lumbar radiculopathy; 3) neck pain and cervicalgia; 4) chronic headaches; and, 5) occipital neuritis. Plaintiff was to undergo a left occipital nerve block and was to consider a cervical MRI in the near future.  Flexeril and Ambien CR were discontinued and plaintiff was prescribed Zonegran, Phenergan, Cambia, Lortab, and Lunesta with Lyrica to be considered at the next visit.  (Tr. p. 239).  Plaintiff's pain was rated as an "8" when she was next seen by Dr. Haydel on September 7, 2011.  She reported 50% relief following a left occipital nerve block on August 22, 2011 and also that Lunesta was not effective.  A cervical MRI was to be scheduled and she was prescribed Ambien CR, Skelaxin, and Lortab.  (Tr. pp. 237, 238, 282).

As noted earlier, a hearing de novo before an ALJ went forward on September 16, 2011.  After the documentary exhibits were admitted into evidence, plaintiff's counsel gave an opening statement in which he argued that plaintiff's migraine headaches, when coupled with her degenerative disc disease of the lumbar spine, lumbar radiculopathy, and neck pain would reduce her residual functional capacity ("RFC") to less than a full range of sedentary work and would preclude her ability to engage in substantial gainful activity.  Upon hearing counsel's argument, the ALJ questioned whether plaintiff's headaches were chronic as opposed to migraine and whether they met the durational requirement

needed to constitute a severe impairment.  Counsel then referenced a certain exhibit as evidence of the required duration and noted that an MRI had been scheduled for September 19, 2011 which may shed further light on plaintiff's condition.  The ALJ agreed to leave the record open for submission of that additional evidence.  (Tr. pp. 24-33).

Plaintiff then took the stand and was questioned by her attorney.  She was forty-four years of age at the time, stood 5'7" tall, and weighed one hundred eighty-one pounds, having gained ten pounds due to a lack of exercise.  She had attended twelve years of formal education as well as beauty school.  Plaintiff had last worked for a total of seven days in early 2007 at some unidentified job but was not able to continue despite accommodations being made.  Prior to that, she had worked until December of 2006 when she suffered her workplace injury involving a compound miter saw.  Plaintiff continued to receive pain management treatment at the hands of Dr. Haydel.  In terms of her back, plaintiff experienced constant aching, occasional spasms, and occasional stabbing pain which radiated down the legs along with numbness and tingling in the legs and feet.  Without medication, she rated her pain as an "8" which could decrease to a level of "4" with medications although the reduction was not a certainty.  Medications typically provided relief for about three hours.  Leg pain, numbness, and tingling were experienced every day which affected her ability to

engage in normal activities and was relieved very little with medication, three hours at most. (Tr. pp. 33-38).

In terms of her neck pain, that, too, was experienced on a daily basis and ranged from a level of "3" to a "10" and occasionally resulted in a migraine headache requiring hospital treatment. Muscle relaxers provided only partial relief and as many as six doses of medication that eventually did help were taken for migraines that occurred weekly. Those occurrences would reportedly last one to three days and caused photophobia, nausea, and vomiting. Despite Dr. Awasthi's recommendation, surgery had not been performed as Workers' Compensation refused to fund it, its effectiveness could not be guaranteed, and complications and further surgeries were a possibility. Plaintiff testified that her prescribed medications affected her concentration, caused drowsiness, and increased her irritability. Unlike her previous practice of cleaning her house twice a week, plaintiff now did so only every two weeks, taking three days at a time to do so as she had to take numerous breaks. Cooking was limited to quick meals. Plaintiff's husband did all the yardwork and assisted with the household chores. She could no longer ride horses, hunt, fish, four-wheel, or attend LSU games as she once had. (Tr. pp. 38-43).

In terms of her functional abilities, plaintiff estimated that she could stand for fifteen minutes, walk one block, sit for twenty minutes, and lift objects weighing the equivalent of a gallon of

milk.  Even lifting pots to cook was taxing and plaintiff would constantly shift positions while sitting to remain comfortable. She spent from four to six hours per day lying down or seated in her recliner.  Walking, sitting, and riding in a car were the most painful activities and tasks requiring mental acuity took much longer to perform.  As a result of her various conditions, plaintiff testified that she would be unable to perform her past work as a hairdresser or construction welder.  Even jobs that were less physically demanding would be problematic due to her need to recline and medication side effects.  (Tr. pp. 43-47).

Upon being tendered to the ALJ for further questioning, plaintiff testified that her adult worklife was behind her.  She had received weekly Workers' Compensation benefits from January of 2007 to February of 2008 followed by a settlement in which she netted $30,000.  Health insurance was in place through her husband's employment.  In answer to the ALJ's inquiry, plaintiff testified that she would be unable to perform work which allowed for an at-will sit/stand option due to drowsiness, concentration deficits, and irritability.  (Tr. pp. 47-49).

Patricia Ehlinger, a VE, was the next witness to take the stand.  She began by classifying the exertional and skill demands of plaintiff's past job as a hairdresser as involving light, skilled work, those of her past job as a construction welder as involving medium, semi-skilled work, and those of her past job as

17

a sales associate as involving medium, semi-skilled work.  None of those positions had resulted in any transferable work skills.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who had a RFC for light work that required no operation of foot controls with the right foot; involved no climbing of ladders, ropes, or scaffolds; required only occasional stooping, crouching, kneeling, or crawling; and, required only occasional bilateral overhead reaching.  With those limitations in mind, the VE testified that the individual described in the hypothetical question would be able to perform plaintiff's past work as a hairdresser but not the other two jobs.  In addition to the hairdresser job, the described individual could function as a kitchen utility worker, cafeteria attendant, or usher, with significant numbers of such jobs existing in the local and national economies.  (Tr. pp. 49-52).

A second hypo was posed to the VE by the ALJ which contained the same profile as the first one but included an at-will sit/stand option provided that the person was not off-task more than 10% of the time.  With that added limitation in mind, the VE testified that the described individual would not be able to perform plaintiff's past work.  However, the individual could function as a cashier, general office clerk, or counter or rental clerk.  Yet a third hypothetical question was posed to the VE which assumed an

individual of plaintiff's age, education, and work experience with
an RFC for light work but who, due to severe pain associated with
disorders of the back, neck pain, and lumbar radiculopathy
radiating to the right leg, had to withdraw from the work station
at unscheduled times causing work not to be completed in a timely
manner and having insufficient concentration, persistence, or pace
to do even simple, routine tasks on a continuous basis for a full
eight-hour day work schedule.   Faced with that hypothetical
question, the VE testified that the individual described therein
would be unable to perform plaintiff's past work or any other work.
The VE testified that her testimony was consistent with that set
forth in the Dictionary of Occupational Titles ("DOT") and that the
jobs that she had identified in answer to the first two hypos were
representative, not exhaustive.   (Tr. pp. 52-54).   Plaintiff's
counsel had no questions for the VE.  He did, however, argue that
the third hypothetical question most accurately described the
limitations resulting from plaintiff's various impairments.  (Tr.
pp. 54-56).

On September 19, 2011, plaintiff underwent a cervical MRI
which revealed a left paracentral disc protrusion at C5-6 with
resulting moderate cord compression and a central/left paracentral
disc protrusion at C6-7 with resulting moderate cord compression as
well as mild bilateral neural foraminal narrowing.  (Tr. pp. 270-
271, 283-384).

19

On September 27, 2011, plaintiff returned to Dr. Haydel to obtain the MRI test results.  Her medications at the time were Hydrocodone, Skelaxin, Flexeril, and Medrol Dosepak and her occupation was identified as a sales person.  Plaintiff reported that her neck pain, rated as a "6", and headaches were unchanged, that Skelaxin caused side-effects, that Ambien was helpful, and that Lortab was helpful but not long-lasting.  The impression was the same as plaintiff's previous visit except for the addition of cervical disc disease.  Skelaxin was discontinued, Zanaflex, Ambien CR, and Lortab were prescribed, and plaintiff was to undergo a series of cervical ESI's with fluroscopy.  (Tr. pp. 280-281, 272). By the time that plaintiff returned to Dr. Haydel on October 20, 2011, she had undergone the first of the ESI's and 50% relief was reported.  A second injection was to be administered and plaintiff was to return to the clinic in one week.  (Tr. p. 279).

Plaintiff was seen again by Dr. Haydel on October 27, 2011 and reported 50% improvement following another ESI with her pain being rated as a "6".  (Tr. p. 278).  However, on November 3, 2011, she indicated that the series of ESI's had given her no relief.  She complained of severe neck pain, headaches that had improved but not resolved, and left arm pain.  Consultations were to be obtained for her headaches and possible physical therapy and medications were prescribed including Zanaflex, Ambien CR, Lortab, Phenergan, and Imitrex.  (Tr. p. 277).

Plaintiff's principal complaint was almost constant headaches, unrelieved by many different medications, when she was evaluated by Dr. Michael Charlet of the Haydel Clinic on November 17, 2011. However, the headaches, which were occipital and parietal at a level of "6" and accompanied by neck pain, were "much better" following the recent ESI's.  The pain was described as throbbing in nature which could occur as often as three times per week along with nausea, vomiting, phonophobia, and photophobia.  Strength and gait were normal but there was pain to palpation of the cervical paraspinal muscles.  The impression was headaches and neck, low back, and leg pain.  Plaintiff was instructed to use Imitrex at the onset of her next severe headache and was prescribed Inderal for headache prevention.  (Tr. pp. 275-276).

Plaintiff would be seen by Dr. Haydel one final time on November 30, 2011.  She related increased low back and bilateral lower extremity pain but reported 50% relief from the ESI series. Neck pain was now tolerable and was rated as an average of "4" with medication.  Low radiating back pain, the left greater than the right, was present which averaged "6".  Dr. Haydel noted that plaintiff's functionality and activities of daily living were improved with medication with no evidence of misuse.  The impression was the same as plaintiff's previous visit with Dr. Haydel who started her on Neurontin, renewed her prescriptions for Zanaflex, Ambien CR, Lortab, and Phenergan, and instructed her to

21

return in one month.  (Tr. p. 274).

Plaintiff challenges the ALJ's decision to deny her DIB on three grounds.  Before proceeding to those grounds, the Court pauses to note the relevant time period at issue in this litigation.  Plaintiff alleges a disability onset date of December 9, 2006 which was roughly the date of her workplace injury.  Her disability insured status and consequent entitlement to DIB expired on September 30, 2011.  "Thus, to prove that she is entitled to disability benefits, [plaintiff] must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status." Anthony, 954 F.2d at 295.  An impairment which had its onset on became disabling after a claimant's insured status expired cannot serve as a basis for a finding of disability. Owens v. Heckler, 770 F.2d 1276, 1280 (5th Cir. 1985)(citing Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir.), cert. denied, 444 U.S. 952, 100 S.Ct. 428 (1979)).

Plaintiff's three challenges to the Commissioner's decision share a common element and will thus be addressed together.  In her first challenge, plaintiff alleges that the ALJ erred in finding that her headaches were not a severe impairment.  Plaintiff's second challenge is that the ALJ's RFC assessment was flawed because it contained no limitations resulting from her chronic pain and headaches.  In her third challenge to the Commissioner's decision, plaintiff argues that the ALJ erred in relying on the

answer to the hypothetical question that was posed to the VE which contained no chronic pain or headache-related limitations.

In addressing plaintiff's challenges, the Court first observes that she did not identify headaches in and of themselves as a disabling condition in her application for DIB or related paperwork. <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989). As noted above, the relevant time period at issue in this litigation is from December 9, 2006, the alleged onset date, until September 30, 2011, the date plaintiff's insured status expired. For the first nine to ten months of that time period, the medical care that plaintiff received was related solely to her lower back issues. As far as the record reflects, between September 24, 2007 and August 19, 2010, a period of almost three years, plaintiff received no medical treatment whatsoever. It was not until April 9, 2011, some four years and five months after the alleged onset date, that plaintiff made any complaints or received any treatment for headaches. As will be discussed more fully below, in the nearly five-year relevant time period, on only two occasions did plaintiff seek medical treatment specifically for headaches and on only three other occasions did she mention headaches to Dr. Haydel during the course of her follow-up treatment with him for her lower back issues.

The first occasion that plaintiff made any complaints or received any treatment for headaches was on April 9, 2011 when she

presented to the St. Anne General ER.   Although she advised attending medical personnel there that she experienced such headaches every three months, no mention of them was made in Dr. Haydel's most recent treatment note of February 10, 2011. Plaintiff was treated with Demerol and Phenergan and was released with instructions to follow-up with her primary care physician. Plaintiff would return to Dr. Haydel one month later on May 10, 2011.  Once again, no mention of headaches was made by the doctor and plaintiff indicated that she was doing well on her medications.

On the second occasion that she specifically sought treatment for headaches, plaintiff again presented to the St. Anne General ER on August 3, 2011.  Once again, she was treated with Demerol and Phenergan and was discharged with medication prescriptions and a neurology referral.  Plaintiff would be seen by Dr. Haydel two days later at which she admittedly complained to him for the first time of migraine headaches lasting two to three days.   The doctor's impression included chronic headaches and occipital neuritis and occipital nerve blocks were scheduled.  Plaintiff was seen again by Dr. Haydel on September 7, 2011 and reported that the nerve block had provided her with 50% relief.  A condition that can reasonably be remedied or controlled by medication is not disabling. Lovelace, 813 F.2d at 59, and to be disabling, pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment.  Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994).  At

the administrative hearing that was subsequently held on September 16, 2013, plaintiff acknowledged that her headaches were relieved with medication although she did have to take multiple doses.

Plaintiff was seen by Dr. Haydel one final time during the relevant time period on September 27, 2011, reporting that her neck pain and headaches were unchanged. The treatment note of this date identifies plaintiff's occupation as that of a sales person. (Tr. p. 280). Once again, chronic headaches and occipital neuritis were included in Dr. Haydel's impression and cervical ESI's were scheduled. In none of the foregoing headache-related treatment records did any of the doctors advise plaintiff to limit her activities in any way, another proper consideration in determining her disability status. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995); Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1989).

Plaintiff's DIB insured status expired three days later on September 30, 2011. At plaintiff's next two return visits to Dr. Haydel, she acknowledged that the ESI's had provided her with 50% relief and at the third visit she admitted that her headaches had improved, a sentiment that she echoed to Dr. Charlet, the neurologist, on November 17, 2011. Neck pain was described as "tolerable" to Dr. Haydel on November 30, 2011 who noted that her functionality and activities of daily living had improved with medication. The mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an

automatic ground for obtaining Social Security benefits.  <u>Owens</u>, 770 F.2d at 1281 (citing <u>Jones</u>, 702 F.2d at 621 n.4).  It also appears from the record that plaintiff was uncooperative in submitting to a consultative evaluation by a doctor of the Commissioner's choosing at which the functionally limiting effects of her headaches might better be assessed.  (Tr. pp. 60-62).

Subjective evidence does not take precedence over objective evidence.  <u>Villa</u>, 895 F.2d at 1024.  In light of the body of objective evidence that was before her, the ALJ did not err in finding that plaintiff's headaches were not a severe impairment because they did not significantly limit her from performing work-related activities for twelve continuous months during the relevant time period.  20 C.F.R. §§404.1520(a)(4)(ii), (c) and 404.1521; <u>Joubert v. Astrue</u>, 287 Fed.Appx. 380, 382-83 (5th Cir. 2008); <u>Gilcrease v. Astrue</u>, 235 Fed.Appx. 201, 202 n.1 (5th Cir. 2007)(durational requirement).  More importantly, inasmuch as consideration of plaintiff's application for DIB proceeded past step two of the §404.1520 sequential analysis and was not summarily denied at that step based on the fact that she did not suffer from a severe impairment, her first challenge provides no basis for disturbing the Commissioner's decision.  <u>Adams v. Bowen</u>, 833 F.2d 509, 512 (5th Cir. 1987); <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1011 (5th Cir. 1987); <u>Wagner v. Astrue</u>, No. 08-CV-0519, 2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

As for her remaining challenges, although the ALJ found that plaintiff's headaches, standing alone, were not a severe impairment, she did consider the effects of all of plaintiff's impairments, both severe and non-severe, in adjudicating her entitlement to DIB. (Tr. p. 14). The ALJ also found that the combination of plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms complained of, including chronic pain from her back condition in concert with her migraine headaches, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC assessment that was arrived at. (Tr. p. 16).

In finding plaintiff's testimony regarding the effects of her symptomology to be only partially credible when weighed against the objective evidence of record, the ALJ first gave diminished weight to Dr. Awasthi's opinions as contradictory and lacking a particularized function-by-function analysis. (Id.). Dr. Haydel, who had treated plaintiff in 2007, 2010, and 2011, consistently reported that she exhibited no external signs of discomfort and that her medication regimen was effective in controlling her pain. He never declared plaintiff to be unable to work during the relevant time period. Halley v. Barnhart, 158 Fed. Appx. 645 (5th Cir. 2009). The ALJ further found that a vast disparity existed between the objectively demonstrable medical evidence and the

alleged intensity and persistence of her spinal symptoms and a lack of reliable manifestations of a disabling loss of functional capacity based upon the results of physical examinations that were conducted during the relevant time period. (Id.).  The objective evidence of record simply did not establish that plaintiff would have experienced symptoms, regardless of their source, of a severity, frequency, or duration to prevent her from performing activities outside of the RFC assessment. (Tr. pp. 16-17). As the ALJ's hypothetical question to the VE reasonably incorporated the limitations resulting from plaintiff's impairments which had objective support, including chronic pain resulting from her back issues in concert with symptoms from migraine headaches, the answer to that question provided sufficient support for the conclusion that plaintiff was not disabled.  Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988).

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass</u> <u>v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __3rd__ day of ___January___, 201_.


_____
UNITED STATES MAGISTRATE JUDGE